# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| LISA ANN STONE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 3:12-cv-00921** |
| v. | ) | **Judge Nixon/ Knowles** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket No. 12. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket No. 15.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin should therefore be substituted for Commissioner Michael J. Astrue as the Defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  INTRODUCTION

Plaintiff filed her applications for DIB and SSI on March 19, 2009, alleging that she had been disabled since January 7, 2009, due to fibromyalgia and sleep apnea.[2]  Docket No. 10, Attachment ("TR"), TR 60, 117, 167.  Plaintiff's applications were denied both initially (TR 60, 61) and upon reconsideration (TR 62, 63).  Plaintiff subsequently requested (TR 80) and received (TR 89) a hearing.  Plaintiff's hearing was conducted on November 30, 2010, by Administrative Law Judge ("ALJ") Donald E. Garrison.  TR 31.  Plaintiff and vocational expert ("VE"), Michelle McBroom-Weiss, appeared and testified. *Id*.

On December 10, 2010, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR 7. Specifically, the ALJ made the following findings of fact:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
>
> 2.   The claimant has not engaged in substantial gainful activity since January 7, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3.   The claimant has the following severe impairments: Fibromyalgia; Obstructive Sleep Apnea; Obesity; Coronary Artery Disease, status post pacemaker implantation; Adjustment Disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.   After careful consideration of the entire record, the

---

[2] At some point, Plaintiff also alleged disability due to a pacemaker, depression, and anxiety.  TR 10, 64.

2

undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, consistent with the performance of light work as defined in 20 CFR 404.1567(b) and 416.967(b), expect as follows: The claimant is limited to jobs requiring only occasional posturals of climbing, balancing, stooping, crouching, kneeling, or crawling. She is further limited to jobs that involve no exposure to unprotected heights, moving machinery, or driving. With respect to the claimant's mental limitations, she can understand, remember, and carry out short and simple decisions and make judgments on simple work-related decisions, but is limited to jobs involving no more than occasional contact with public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December 6, 1966 and was 42 years old, which is defined as a younger individual (age 18-49), on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 7, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

TR 12-26.

On December 10, 2010, Plaintiff timely filed a request for review of the hearing

3

decision. *See* TR 1. On July 9, 2012, the Appeals Council issued a letter declining to review the case (*Id.*), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of Record. Accordingly, the Court will discuss those matters only to the extent necessary to analyze the parties' arguments.

## III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner

4

if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

### B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

determination. *Id.* In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

## C. Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ failed to appropriately: 1) weigh the physician opinion evidence of record; 2) consider and evaluate all of Plaintiff's alleged impairments; 3) assess Plaintiff's Residual Functional Capacity ("RFC"); 4) consider the exacerbating effects of Plaintiff's obesity; and 5) evaluate Plaintiff's credibility. Docket No. 12-1. Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery*

*v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994).

## 1.  Weight Accorded to Physicians' Opinions

Plaintiff maintains that the ALJ did not accord appropriate weight to the medical opinions of the physicians of record.  Docket No. 12-1 at 7,15. Specifically, Plaintiff argues that the ALJ should have accorded greater weight to the opinions of treating physicians, Dr. Jennifer L. Montague and Dr. Victor Byrd because they were "not actually contradicted by other medical evidence." *Id*. at 7-13.  Plaintiff asserts that the ALJ did not provide an adequate rationale for dismissing their opinions. *Id.*  Plaintiff additionally argues that the ALJ accorded too much weight to the opinions of State Agency consultants, Dr. Anita Johnson and Dr. Marvin Cohn, because they were rendered prior to the submission of some evidence of record (specifically Exhibits 18F-21F). *Id.* at 15-16.  Plaintiff argues that, accordingly, the ALJ could not have based his opinion on the record as a whole, and that he erred in using their opinions, in part, to determine Plaintiff's RFC. *Id.* at 15-16.

Defendant responds that, in according "little weight" to the opinions of Drs. Montague and Byrd, and "some weight" to the opinions of Drs. Johnson and Cohn, the ALJ properly weighed the medical opinions of record.  Docket No. 15 at 7. Defendant argues that the ALJ discussed the medical opinions at length and clearly articulated his rationale for the weight he accorded to the various physicians opinions of record. *Id.* at 7-12, *citing* TR at 18-21. Specifically, Defendant notes that the ALJ found the statements of Dr. Montague and Dr. Byrd to be neither well-supported nor well-reasoned. *Id.* at 7-11, *citing* TR 21-22. With regard to the

opinions of State Agency medical consultants, Dr. Johnson and Dr. Cohn, Defendant argues that

the ALJ found them to be most consistent with Plaintiff's medical record and her reported daily

activities. *Id.*

With regard to the evaluation of medical evidence, the Code of Federal Regulations

states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques *and is not inconsistent with the other substantial evidence in your case record*, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. ...
>
> (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. ...
>
> (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
>
> (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a

9

specialist.

. . .

20 C.F.R. § 416.927(d) (emphasis added).  *See also* 20 C.F.R. § 404.1527(d).

The ALJ must articulate the reasons underlying his decision to give a medical opinion a specific amount of weight.[4]  *See, e.g.,* 20 C.F.R. § 404.1527(d); *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  The reasons must be supported by the evidence and must be sufficiently specific so as to make clear to any subsequent reviewers the weight the ALJ gave to the treating source medical opinion and the reasons for that weight.  SSR 96-2p.

The Sixth Circuit has held that, "provided that they are based on sufficient medical data, the medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."  *Howard v. Commissioner*, 276 F.3d 235, 240 (6th Cir. 2002)(*quoting Harris v. Heckler*, 756 F.3d 431, 435 (6th Cir. 1985)).  If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.

---

[4] There are circumstances when an ALJ's failure to articulate good reasons for the weight accorded to medical opinions may constitute harmless error: (1) if a treating source opinion is so patently deficient that the ALJ could not possibly credit it; (2) if the ALJ adopts the opinion or makes findings consistent with the opinion; and/or (3) if the ALJ has complied with the goal of 20 C.F.R. §1527(d), by analyzing the physician's contradictory opinions or by analyzing other opinions of record.  *See, e.g., Friend v. Commissioner*, 375 Fed. Appx. 543, 551 (6th Cir. April 28, 2010); *Nelson v. Commissioner*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006); *Hall v. Commissioner*, 148 Fed. Appx. 456, 464 (6th Cir. 2006).

10

20 C.F.R. § 404.1502.

As the ALJ articulated, Dr. Montague saw Plaintiff on five occasions: January 5, 2009, March 27, 2009, May 26, 2009, January 14, 2010, and February 19, 2010. TR 18-20, *citing* 273-81, 329-30, 333-53. Discussing Plaintiff's first visit to Dr. Montague, the ALJ stated:

> The record reflects an unusual instance where the medical source statements from Jennifer L. Montague, M.D., actually predates [*sic*] nearly all of her treatment records from the same professional; therefore, it is necessary to turn to the statements first. Dr. Montague explains that she first saw the claimant on January 5, 2009. At that time, the claimant was alleged to experience significant pain with myalgias, but did not present with a fever. She went on to say that all tested bloodwork came back normal. When symptoms did not improve, she saw another unnamed doctor at the clinic during Dr. Montague's absence. Arterial and venous doppler testing performed at the time had been unremarkable, so she was referred to a rheumatologist (Ex. 15-F).

TR 18-19, *citing* TR 329-30.

Recounting Plaintiff's March 27, 2009 visit to Dr. Montague, the ALJ stated:

> March 27, 2009 represents the next time the claimant saw Dr. Montague, according to the physician's statement. She filled out a chest pain questionnaire provided by the State agency, in which she denied that the claimant was actually experiencing this particular symptom, but rather had complaints of generalized muscle pain instead. She also filled out a mental health questionnaire, in which she acknowledged prescribing psychotropic medications, yet opined that she had no mental health impairment. Most of the comments, instead, focused on the fibromyalgia. Dr. Montague wrote that the claimant was diagnosed with fibromyalgia by a rheumatologist in early January of 2009, and went on to say that the claimant is unable to lift, stand, walk, bend or squat, and has additional limitations with respect to speaking, sitting, or hearing. She concluded by saying that the claimant requires use of narcotic pain medications. She specifically declined to test the claimant's range of motion or document specific limitations in this regard (Ex. 9-F).

TR 19, *citing* TR 273-81 (internal footnote omitted).

Plaintiff next saw Dr. Montague on May 26, 2009. TR 19, *referencing* TR 348-53. As

discussed by the ALJ, this was a follow-up visit, but Plaintiff presented with a rash for which lab work was ordered; Dr. Montague refilled a Lortab prescription. *Id.*

Plaintiff's last two visits to Dr. Montague were in January and February 2010.

Recounting Plaintiff's January 14, 2010 and February 19, 2010 visits, the ALJ stated:

> Dr. Montague's record falls silent until January 14, 2010, and at this point the claimant returned for follow-up for her fibromyalgia and depression, during which time, whole-body pain was again alleged. Prescriptions were filled for Lortab and Cymbalta, and samples of Savella were provided, and that was the extent of treatment on this occasion. On February 19, 2010, the claimant reported to Dr. Montague that she had not taken pain medication in over a week, and feels she does not need it, although she reported abdominal pain likely related to her diagnosed ovarian cysts. This represents the last encounter in the file (Ex. 18-F). The claimant confirmed this during testimony, stating that she only saw Dr. Montague for approximately six months in total.

TR 20, *referencing* TR 333-47, *but citing* TR 333-53.

After having thoroughly recounted Dr. Montague's treatment history of Plaintiff, the ALJ addressed Dr. Montague's two expressed medical opinions. TR 20-21. The ALJ noted that Dr. Montague's first opinion, dated March 30, 2009, details Plaintiff's March 27, 2009 visit, discussed above. TR 20, *citing* 273-81. The ALJ discussed Dr. Montague's second opinion, dated June 30, 2009, as follows:

> In the second, dated June 30, 2009, the physician recounts the brief history as between the claimant's first encounter on January 5 of that year and the consultation with the Dr. Byrd [*sic*]. In this letter, Dr. Montague stated only that as a general proposition that [*sic*] fibromyalgia symptoms are disabling, and went on to reiterate the claimant's subjective complaints: "In Ms. Stone's case, I do not think she has felt well enough to return to work since her initial presentation in early January."

TR 20-21, *citing* TR 329-30.

With regard to the weight to be accorded Dr. Montague's opinion, the ALJ found that

12

there was little evidence in the record to support Dr. Montague's assessments. TR 20. The ALJ explained:

> The undersigned recognizes and accepts that the statements were made by a treating physician. However, the question to be asked, consistent with Social Security Ruling 96-2p, is whether the statements are well supported, or whether there is a reasonable basis for the conclusions that were presented. The answers here must be in the negative. First, Dr. Montague asserted that the claimant is unable to lift, stand, walk, bend or squat secondary to fibromyalgia, but this is plainly at odds with claimant's own reports and testimony regarding her own activities, and in addition to this, the physician declined to evaluate or objectively quantify the claimant's range of motion. Second, there is, at most, a limited history as between the claimant and the physician, especially on the dates when each statement was made. Third, Dr. Montague acknowledged that she did not diagnose the condition on her own, yet she relied upon–by all appearances– a tentative diagnosis by Dr. Byrd based on a single consultation, without any record of further consultations or follow-ups with the rheumatologist, and certainly without indication that the specialist had the benefit of all relevant objective data. Fourth, and most fundamentally, after the claimant's last encounter with Dr. Montague, there is a significant longitudinal history in which the claimant's presentation and physical examination was inconsistent with someone experiencing the severe pain and sensitivity of fibromyalgia, even though she had other physical complaints. Finally, the claimant acknowledged during testimony that her treatment with Dr. Montague did not extend beyond six months, and according to the record, even this was sporadic. Hence, there is not a reasonable basis for the opinions, and accordingly, the same shall be given little weight.

TR 21.

Dr. Montague saw Plaintiff on five occasions, a fact that could justify the ALJ's according greater weight to her opinion than to other opinions, as long as that opinion was supported by medically acceptable clinical and laboratory diagnostic techniques, and consistent with the evidence of record. As has been noted, however, Dr. Montague saw Plaintiff five times sporadically over a period of only six months, and her opinion contradicts other substantial evidence in the record. As the Regulations state, the ALJ is not required to give controlling

13

weight to a treating physician's evaluation when that evaluation is inconsistent with other substantial evidence in the record. *See* 20 C.F.R. § 416.927(d)(2) and 20 C.F.R. §404.1527(d)(2). Instead, when there is contradictory evidence, the treating physician's opinion is weighed against the contradictory evidence under the criteria listed above. *Id.* When the opinions are inconsistent with each other, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. 20 C.F.R. § 416.927(e)(2). As such, the Regulations do not mandate that the ALJ accord Dr. Montague's evaluation significant or controlling weight. Accordingly, Plaintiff's argument fails.

Regarding Plaintiff's claim that the ALJ did not accord Dr. Victor M. Byrd's opinion adequate weight, the ALJ thoroughly discussed Plaintiff's visit with Dr. Byrd and his corresponding medical opinion. Recounting Plaintiff's consultative appointment with Dr. Byrd, the ALJ stated:

> The undersigned turns now to the record of Victor M. Byrd, M.D., the rheumatologist in question. His records are extremely brief, and consists [*sic*] *solely* of the initial consultation, which was performed on January 26, 2009. At the time of Dr. Byrd's examination of the claimant, she had the appearance of a groomed, healthy individual in no distress, but went on to observe diffuse myofascial tender or trigger points, but with no observed synovitis in the joints; there was also a preserved range of motion. During this encounter, Dr. Byrd raised a *possible* diagnosis of fibromyalgia versus systemic vasculitis, but he wanted to rule out degenerative disc disease as well. For these reasons, he wanted the claimant to return for x-rays, stating he did not have time to have them done on this occasion, and for her to forward the results of her cardiology and sleep studies as soon as they were available. He went on to provide the claimant with a booklet about fibromyalgia, and included on the chart a notation that she is unable to return to work yet. (Notwithstanding the tentative nature of Dr. Byrd's conclusions on this date, the claimant announced to her cardiologist shortly afterwards that she was diagnosed with fibromyalgia, *see* Ex. 4-F at 3.) There is no indication the claimant ever followed-up with Dr. Byrd, undertook the needed x-rays, or provided him with the requested medical records. Indeed, Dr. Byrd

14

later confirmed that there were no further treatment records apart from the original consultation (Ex. 8-F, 12-F). He later provided a medical source statement dated March 29, 2009. . .

TR 19, *citing* TR 229, 266-72, 300-02 (emphasis original).

Discussing the opinions rendered in Dr. Bryd's Medical Source Statement and the rationale for his decision not to accord Dr. Byrd's opinion great weight, the ALJ stated:

. . . In his letter of March 29, 2009, he opines that the claimant "is unable to work due to her very severe features of fibromyalgia," together with her sleep disorder, and that as a result, she is unable to regularly lift more than five pounds, cannot perform postural activities of bending, pushing, or crawling, requires multiple rest periods after prolonged standing or walking, and cannot climb more than a few steps. He went on to make the general statement that the claimant would experience significant cognitive and memory deficits and that interpersonal functioning would be adversely affected, further precluding work-related activity (Ex. 8-F).

There is again little reason to provide Dr. Byrd's opinion with controlling weight. In the first instance, it is debatable whether Dr. Byrd can even be considered as a treating physician, seeing that his findings were based on a single consultation, with no follow-up encounters (even though at least one follow-up was anticipated by him). But even assuming that he is a treating physician, the same facts noted with respect to Dr. Montague's statements are applicable here. On a longitudinal basis, especially during the interval since the claimant's latest encounter with either physician, there is little in the way of objective findings that would tend to even show that her fibromyalgia is an severe medical condition [*sic*], let alone whether it results in the severe to extreme limitations now being propounded.

TR 21, *citing* TR 266-72 (footnote omitted).

As noted by the ALJ, Dr. Byrd saw Plaintiff on only one occasion, for one consultative appointment, and his opinion was neither supported by the objective testing that he requested or by other medical evidence in the record. Additionally, Dr. Byrd's opinion is inconsistent with the opinions of Dr. Johnson and Dr. Cohn, which will be discussed below. Accordingly, the

15

Regulations do not mandate that the ALJ accord Dr. Byrd's evaluation significant or controlling weight.

Summarizing his findings pertaining to the opinions of Dr. Montague and Dr. Byrd, the ALJ stated:

> The medical source statements of Dr. Montague and Dr. Byrd were already discussed at length, and as mentioned, had been provided with little weight as being unsupported by the medical evidence, with asserted limitations not only at odds with objective findings, but with the claimant's own statements and testimony concerning her daily activities.

TR 22.

With regard to Plaintiff's claim that the ALJ accorded too much weight to the opinions of State Agency consulting physicians, Drs. Anita L. Johnson and Marvin H. Cohn, an ALJ may consider the opinion of a non-examining physician designated by the Secretary in determining whether a claimant has medically determinable impairments. *Reynolds v. Secretary*, 707 F.2d 927, 930 (6th Cir. 1983). In the case at bar, the ALJ considered the medical opinions of Dr. Johnson and Dr. Cohn, and accorded them "some weight." TR 23. Specifically, the ALJ stated:

> On May 27, 2009, Anita L. Johnson, M.D., a non-examining State agency medical consultant, based upon her review of the medical records as they then existed, concluded that the claimant was capable of light work, with no postural and some moderate environmental limitations (Ex. 14-F). On reconsideration, Marvin H. Cohn, M.D., also a non-examining State agency medical consultant, concurred with Dr. Johnson's conclusions (Ex. 17-F). Although the medical evidence tends to support the conclusions of both panelists, the undersigned will conclude that the claimant has greater limitations, and for this reason, they will be given some but not substantial weight.

TR 23, *citing* 318-26, 332.

Although Plaintiff is correct in noting that Drs. Johnson and Cohn rendered opinions prior to the inclusion of additional information in the record (specifically, Exhibits 18F-21F,

dated between May 26, 2009 and September 9, 2010), Plaintiff is incorrect in arguing that the ALJ could not have considered the record in its entirety if he relied, in part, on their opinions when rendering his RFC determination of Plaintiff. The ALJ's discussion of the medical and testimonial evidence of record clearly demonstrates that he considered evidence subsequent to the rendering of the opinions of Drs. Johnson and Cohn (*see, e.g.,* the ALJ's discussion of Plaintiff's January and February 2010 visits to Dr. Montague, recounted above, and the ALJ's explicit discussion of the subsequent evidence, including Exhibits 18-F through 21-F, discussed below). Moreover, the ALJ explicitly accorded the opinions of Drs. Johnson and Cohn "some but not substantial weight." TR 23.

The ALJ explained how he determined Plaintiff's RFC, stating:

> . . . The undersigned credits the State agency medical consultants regarding the claimant's capacity for light work, noting testimony that she is able to occasionally lift her own granddaughter, who weighs 20 pounds, and further taking into account all of the claimant[']s other activities. Her limitation with respect to only occasional postural activities is significantly more restrictive than those given by the State agency medical consultants, and had been included in an effort to provide the claimant, as much as possible, with the benefit of the doubt regarding her fibromyalgia symptoms to the extent the limited evidence will allow. Her environmental limitations were also more restrictive than those provided by the panelists, and were included for similar reasons.

TR 23.

The ALJ considered the opinion evidence discussed above, as well as the other objective and testimonial evidence of record (which will be discussed in subsequent statements of error in greater detail), and ultimately determined that the opinions of Dr. Montague and Dr. Byrd should be accorded "little" weight, while the opinions of Dr. Johnson and Dr. Cohn should be accorded "some" weight. This is within the ALJ's province. As has been noted, when there are conflicting opinions in the record, the final decision regarding the weight to be accorded to the

17

opinions lies with the ALJ. The ALJ properly considered the conflicting opinion evidence and, as can be seen in the quoted passages above, appropriately explained the reasons for his determination. The ALJ's decision in according relative weight to these physician opinions was proper; Plaintiff's argument fails.

## 2. Consideration of Alleged Impairments and Determining Impairments are Nonsevere

Plaintiff notes that, in addition to the severe impairments found by the ALJ, Plaintiff had also been diagnosed with type II diabetes mellitus, peripheral vascular disease, syncope, and carpal tunnel syndrome. Docket No. 12-1 at 13. Plaintiff argues that although the ALJ discussed these impairments, the ALJ did not adequately explain his rationale for finding them to be nonsevere. *Id.* Plaintiff asserts that these impairments impose additional limitations on his ability to perform work at the RFC determined by the ALJ. *Id.*

Defendant responds maintaining that the ALJ properly considered all of Plaintiff's alleged impairments. Docket No. 15 at 12. Additionally, Defendant argues that "if an ALJ finds at least one impairment severe at step two, it is immaterial whether other impairments are also found to be severe at step two; remand is only necessary if the ALJ's RFC finding fails to account for all of a claimant's impairments." *Id.*, *citing Maziarz v. Secretary of H.H.S.*, 837 F.2d 240, 244 (6th Cir. 1987). Defendant also notes that, contrary to Plaintiff's assertion, the ALJ spent "10 full paragraphs" specifically addressing Plaintiff's alleged impairments of ovarian cysts, diabetes mellitus, lung disease, peripheral vascular disease, hypertension, lipid disorder, syncope, blurred vision, carpal tunnel syndrome, and gastrointestinal problems. *Id.* at 12-13, *citing* TR 13-15.

As an initial matter, an impairment can be considered nonsevere only if it is so slight that it could not result in a finding of disability, no matter how adverse a claimant's vocational

18

factors might be. *See, e.g.*, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Salmi v. Secretary of H.H.S.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir.1985). When an ALJ finds that a claimant has at least one severe impairment and proceeds to complete the sequential evaluation process, however, the ALJ's failure to find that another condition is a severe impairment cannot constitute reversible error. *See Maziarz*, 837 F.2d at 244.

In the case at bar, the ALJ discussed Plaintiff's nonsevere impairments in turn. Specifically, the ALJ stated:

> The claimant, through counsel (via a brief submitted prior to the hearing), alluded to a number of other impairments, including diabetes mellitus, ovarian cysts, lipid disorder, hypertension, lung disease (mentioned separately from her obstructive sleep apnea), peripheral vascular disease, and carpel tunnel syndrome (Ex. 12-E). But the claimant's testimony was that her fibromyalgia was the main reason why she ended her last job and also the main reason why she is no longer able to sustain work-related activities. In most instances, the other impairments were not mentioned at all during testimony, while others were touched upon only briefly. As to all of these impairments, it is worth bearing in mind that the claimant has the burden of proving disability by furnishing medical and other evidence that can be used to reach conclusions regarding her alleged physical impairments. *See* 20 CFR 404.1512(a) and 416.912(a). In this instance, upon careful review of the entire record, the evidence does not support a finding that any of the aforementioned impairments more than minimally affects her ability to perform work-related activities. Besides this general statement, the following is a brief discussion regarding each specific impairment, to the extent the limited medical evidence will allow.
>
> The claimant's ovarian cysts appear to be a relatively recent development, as the earliest diagnosis of the condition, from an emergency room encounter at Hendersonville Medical Center, happened on March 3, 2010, with follow-up at Nashville General Hospital beginning on March 4. Objective studies indeed confirm the presence of small cysts appearing bilaterally. The latest reports, dating in September of this year, show that the claimant intended to undergo surgery to correct the cysts, but clearance for

19

the surgery was delayed approximately two weeks with the recommendation that she use Synthroid during this time (Ex 18-F, 19-F, 21-F). In addition to the general statement the undersigned made above, the evidence is also insufficient to support a finding that the impairment is expected to last for one year or longer.

The claimant has experienced diabetes mellitus during the entire interval since the alleged onset date, and there are elevated blood glucose readings in the record. However, there is no evidence of any ongoing neurological deficits related to the medical condition, such as the presence diabetic neuropathy, and little to show that there have been other complications attributable to this medical condition. Additionally, the more recent treatment notes go on to say that the claimant's compliance with treatment has been poor and that she follows no particular diet (Ex. 18-F at 10).

With respect to the claimant's lung disease, although objective studies are remarkable in detecting the presence of a small nodule in the right mid-lung, there is no evidence of an acute process, and also no evidence that the nodule in question is other than static (Ex. 1-F, 3-F at 6, 13F). *See also* Ex. 4-F (treating cardiologist defines lung disease mainly as obstructive sleep apnea in the setting of lungs clear to auscultation with normal chest size and excursion); 18-F (consistently unremarkable respiratory findings despite complaints that included dyspnea, with no pulmonary disease other than sleep apnea included as an active diagnosis); 21-F (chest and lungs consistently unremarkable), *but see* Ex. 13-F (chest pain and pain with breathing in setting of resumption of smoking). Therefore, the evidence does not support a finding that the claimant has a medically determinable impairment, above and beyond her obstructive sleep apnea, that more than minimally affects work-related activities.

While there was mention of peripheral vascular disease, evidence regarding the condition was especially minimal. In the records of Nicholas J. Lippolis, M.D., it was mentioned as an undefined problem to be examined further through a cardiac CT angiogram, but this test was unremarkable except to disclose moderate coronary disease involving the left anterior descending artery involving the formation of soft plaque (Ex. 4-F). Victor Byrd, M.D., in his review of these records, would later point out that the claimant had extensive evaluation for both venous and arterial peripheral vascular disease, but that he reviewed a normal exam (Ex. 8-F).

With respect to the claimant's hypertension, although the record is

20

remarkable for a diagnosis of the condition, and there are also elevated readings contained within the treatment notes, there is no evidence showing that there has been end-stage organ damage, nor other complications that would result in work-related limitations; in fact, there is hardly a mention of the disorder. (*See also* Ex. 4-F, not included as a problem by cardiologist during consult).

The claimant's lipid disorder may play a contributing role to her coronary artery disease, according to the treatment notes of Dr. Lippolis, and because of this, aggressive cholesterol-lowering therapy was indicated (Ex. 4-F); moreover, the record is remarkable for elevated lipid readings (*see, e.g.,* Ex. 21-F). However, there is no evidence that the lipid disorder, in and of itself, adds in any way to the claimant's work related limitations, nor is there evidence of this even when the impairment is viewed in combination with all others. The claimant's coronary artery disease, of course, will be taken up later in the decision.

The claimant's syncope is generally discussed in the medical history as a symptom, rather than a medical condition in its own right (*see, e.g.,* Ex. 1-F, 2-F, syncopal episodes leading to a diagnosis of conduction system disease with subsequent installation of pacemaker). This, too, will be taken up later in the decision in the context of her coronary artery disease.

During the reconsideration stage, the claimant alleged having blurred vision (Ex. 8-E). Under the Social Security regulations, an "impairment" must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Although the regulations provide that the existence of a medically determinable physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations further provide that under no circumstances may the existence of impairment [*sic*] be established on the basis of symptoms alone. Thus, regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. No symptom or combinations of symptoms by itself can constitute a medically determinable impairment (SSR 96-4p). In this instance, upon careful review, there were no objective findings that would point to the presence of any visual impairment, and the claimant did not testify as to any.

21

Finally, while carpel tunnel syndrome is mentioned, it was only in the broader context of her alleged fibromyalgia (Ex. 7-F, referring back to the consult with Dr. Byrd). Dr. Byrd, in turn, although diagnosing fibromyalgia, declined to also diagnose carpal tunnel syndrome, with the examination showing a negative Tinnel's sign (Ex. 8-F). The later records are unremarkable for symptoms consistent with the syndrome (*see, e.g.*, Ex. 21-F).

Although not mentioned by counsel in the pre-hearing brief (Ex. 12-E) nor in the claimant's prior statements (Ex. 5-E, 6-E, 8-E, 10-E), the claimant alluded to gastrointestinal problems in the course of testimony. For purposes of completeness, this was also a recent development, and closely timed with the diagnosis of ovarian cysts, inasmuch as she complained of diarrhea and abdominal pain at the time the cysts were first diagnosed. Still more recently, in May of this year, the claimant presented at Baptist Hospital on a complaint of increased hemorrhoid and rectal pain. An endoscopy and colonoscopy were ordered in June, which revealed gastroesophageal reflux disease, rectal bleed, internal hemorrhoids, and inflammation involving the esophagus, stomach, duodenum, and rectum. The need for surgical clearance contemplated hemorroid surgery, in addition to which H2 blockers, simethicone, and dietary changes were prescribed (Ex. 18-F, 19-F, 20-F, 21-F). Because of the recent nature of these gastrointestinal problems, the evidence does not support a finding that this condition will last one year or longer or that it more than minimally affects her ability to perform work-related activities.

TR 13-15, *citing* TR 162-65, 166-75, 179-85, 189-95, 199-200, 204-16, 217-20, 221-26, 227-34, 249-65, 266-72, 303-17, 333-53, 354-68, 369-79, 380-440 (footnote omitted).

As can be seen, the ALJ considered each of these alleged impairments at length, supported his discussion with evidence, and explained his rationale for finding these impairments to be nonsevere. Accordingly, the ALJ's decision not to determine that Plaintiff's type II diabetes mellitus, peripheral vascular disease, syncope, and carpal tunnel syndrome were severe impairments does not constitute reversible error. *See*, *e.g.*, *Higgs,* 880 F.2d at 862; *see Maziarz,* 837 F.2d at 244. Plaintiff's argument fails.

**3. Residual Functional Capacity**

22

Plaintiff maintains that the ALJ's RFC determination is inadequate because the ALJ did not complete a function-by-function assessment as required by Social Security Ruling 96-8p. Docket No. 12-1 at 14. Additionally, Plaintiff argues that the ALJ failed to include substantial limitations in the RFC finding correlating to symptoms and limitations that were well-documented in the record. *Id.* Plaintiff asserts that, although the ALJ "addressed the majority of the strength demands in the RFC, this does not excuse his failure to specifically address each of the strength demands as required by the Regulations," thereby rendering the decision "insufficient." *Id.*

Defendant responds that the ALJ's RFC finding was proper. Docket No. 15 at 13. Defendant argues that Plaintiff's argument is without merit because, "[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing." *Id.*, *citing Delgado v. Commissioner of Social Security*, 30 F. App'x 542, 547-48 (6th Cir. 2002)(unpublished opinion). Additionally, Defendant argues that the ALJ's RFC finding was based upon a detailed analysis of the medical evidence, the opinions of record, and Plaintiff's credibility, and was therefore, properly supported by substantial evidence. *Id.*

"Residual Functional Capacity" is defined as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(c). With regard to the evaluation of physical abilities in determining a claimant's Residual Functional Capacity, the Regulations state:

> When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or

23

crouching), may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(b).

As has been demonstrated via the passages quoted in the statements of error above, the record in the case at bar is replete with doctors' evaluations, medical assessments, and test results, all of which were properly considered by the ALJ in determining Plaintiff's "residual functional capacity for work activity on a regular and continuing basis." The ALJ, after evaluating all of the objective medical evidence of record and Plaintiff's reported level of activity, determined that Plaintiff retained an RFC for light work with additional limitations.[5] TR 17. In reaching this RFC determination, the ALJ stated:

> In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-6p, and 06-3p.
>
> . . .

---

[5] The ALJ's complete RFC finding, including the additional limitations as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, consistent with the performance of light work as defined in 20 CFR 404.1567(b) and 416.967(b), expect as follows: The claimant is limited to jobs requiring only occasional posturals of climbing, balancing, stooping, crouching, kneeling, or crawling. She is further limited to jobs that involve no exposure to unprotected heights, moving machinery, or driving. With respect to the claimant's mental limitations, she can understand, remember, and carry out short and simple decisions and make judgments on simple work-related decisions, but is limited to jobs involving no more than occasional contact with public.

TR 17.

24

Specifically, in reaching the above conclusion regarding the claimant's residual functional capacity, the undersigned has considered, as applicable or as found in the record, the allegations contained within all reports and questionnaires completed by the claimant, and the further statements furnished by the claimant as well as those submitted by third parties. Additionally, the undersigned has considered the claimant's allegations at the hearing regarding disability symptoms, including pain and substantial limitations in her ability to carry out activities of daily living. These allegations were not discounted solely on the basis of any deficiencies with the objective medical evidence, to the extent any such deficiencies have been identified. Rather, full consideration has been afforded to all of the evidence presented relating to subjective complaints, including, as appropriate and applicable herein, the claimant's prior work record and observations by third parties and treating and examining physicians relating, as appropriate, to such matters as: the claimant's daily activities; the duration, frequency, and intensity of any pain and other symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects, if any, from medications; functional restrictions; treatment, other than medication, that is received for pain or other symptoms; and any measures other than treatment that are used to relieve pain or other symptoms (20 CFR 404.1529, 416.929, and SSR 96-7p).

TR 17-18.

Additionally, the ALJ considered the Physical RFC Assessment completed by Dr. Johnson, dated May 27, 2009, in which Dr. Johnson opined that Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour day; and push and/or pull without limitation. TR 17, 23, 318-26. Additionally, Dr. Johnson opined that Plaintiff had no postural, manipulative, visual, or communicative limitations, but should not be exposed to extreme heat, cold, or hazards such as machinery or heights. TR 318-26.

The ALJ's determination that Plaintiff retained an RFC for light work with additional limitations is supported by physicians' opinions, as discussed in the first statement of error;

Plaintiff's medical history, discussed *passim*; and Plaintiff's subjective complaints of pain, discussed above and in the fifth statement of error. TR 17-24. The ALJ considered the record in its entirety and reached a reasoned decision that was supported by substantial evidence. Because substantial evidence supports the ALJ's RFC determination for Plaintiff, the ALJ's determination must stand.

## 4.   Consideration of Plaintiff's Obesity

Plaintiff maintains that the ALJ failed to consider the exacerbating effects of Plaintiff's obesity on her other physical conditions. Docket No. 12-1 at 15. Specifically, Plaintiff argues that, when determining her RFC, the ALJ did not perform a sufficient analysis of her obesity and how it affects her ability to sit, stand, walk, lift, and carry. *Id.* Plaintiff notes that, "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *Id., quoting* SSR 02-1p. Plaintiff acknowledges that the ALJ found Plaintiff's obesity to be a severe impairment, but argues that the ALJ used "boilerplate language," and therefore failed to conduct a true analysis of the effects of Plaintiff's obesity as required by SSR 02-1p. *Id.*, *citing* TR 12 .

Defendant responds that the ALJ properly considered Plaintiff's obesity in detail. Docket No. 15 at 13-14. Defendant notes that the ALJ found that Plaintiff's obesity was a severe impairment, but that, when analyzed individually and in combination with Plaintiff's other impairments, it did not satisfy any of the relevant listing criteria. *Id.* at 13-14, *referencing* TR 12-13, 16. Defendant additionally argues that the ALJ appropriately discussed the effects of Plaintiff's obesity on her other diagnosed impairments. *Id.* at 14, *citing* TR 22.

As an initial matter, on October 25, 1999, the Commissioner deleted the specific listing

26

for obesity, and instead, inserted language in the preambles to the musculoskeletal, respiratory, and cardiovascular listings requiring that the effects of obesity be considered in evaluating those impairments. 64 Fed. Reg. 46,122 (August 24, 1999). In the case at bar, the ALJ properly considered the effects of Plaintiff's obesity relating to Plaintiff's specific impairments. With regard to the exacerbating effects of Plaintiff's obesity, the ALJ stated:

> Turning to the claimant's obesity, this is a recurring theme which served to contribute to her obstructive sleep apnea and likely also played a role in events involving shortness of breath and her coronary artery disease. It is unclear whether it also played an indirect role in events leading to the need for a pacemaker: She reported that shortly before her syncopal episodes in 2004, she had just started taking over-the-counter diet pills (Ex. 1-F). Be that as it may, there is little discussion of the condition in its own right, save that she has been counseled on a number of occasions to modify her diet. She also reported that she was sleeping better, her fatigue level had improved at a time when she did lose weight; however, it was also noted that compliance with treatment was poor (*Id.* at 10).

TR 22, *citing* 204-16.

As can be seen, contrary to Plaintiff's assertion that the ALJ merely employed "boilerplate language" regarding her obesity, the ALJ, in fact, did specifically consider the effect of Plaintiff's obesity on her other impairments. Because the ALJ properly discussed Plaintiff's obesity and the effect that it had on her other impairments, Plaintiff's argument fails.

**5.   Consideration of Plaintiff's Credibility**

Plaintiff contends that in finding that her subjective complaints were not fully credible, the ALJ did not appropriately address her complaints of pain. Docket No. 12-1 at 17. Plaintiff argues that the ALJ's stated compliance with SSR 96-7p is inconsistent with the ALJ's analysis. *Id.* Specifically, Plaintiff argues that the ALJ made "conclusory statements," failed to properly

27

consider Plaintiff's fatigue and pain questionnaires, and placed too much emphasis on Plaintiff's reported daily activities. *Id.* at 17-18, *referencing* TR 20, 35-48, 159-61, 162-65.

Defendant responds that the ALJ addressed Plaintiff's credibility in detail. Docket No. 15 at 14. Defendant notes that the ALJ considered the medical evidence, reports and questionnaires completed by Plaintiff as well as third parties, and Plaintiff's hearing testimony when determining the credibility of Plaintiff's subjective complaints of pain. *Id.* at 14-15, *citing* TR 18-20. Defendant also notes that, with regard to Plaintiff's allegations of mental impairments, the ALJ later discussed Plaintiff's allegations of mental impairments, finding supporting medical evidence in the record to be minimal. *Id.* at 16, *citing* TR 23.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability...[T]here must be evidence of an underlying medical condition *and* (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition *or* (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").

28

Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the case at bar, the ALJ explicitly stated:

> [T]he undersigned has considered, as applicable or as found in the record, the allegations contained within all reports and questionnaires completed by the claimant, and the further statements furnished by the claimant as well as those submitted by third parties. Additionally, the undersigned has considered the claimant's allegations at the hearing regarding disability symptoms, including pain and substantial limitations in her ability to carry out activities of daily living. These allegations were not discounted solely on the basis of any deficiencies with the objective medical evidence, to the extent any such deficiencies have been identified. Rather, full consideration has been afforded to all of the evidence presented relating to subjective complaints, including, as appropriate and applicable herein, the claimant's

29

> prior work record and observations by third parties and treating
> and examining physicians relating, as appropriate, to such matters
> as: the claimant's daily activities; the duration, frequency, and
> intensity of any pain and other symptoms; precipitating and
> aggravating factors; dosage, effectiveness, and side effects, if any,
> from medications; functional restrictions; treatment, other than
> medication, that is received for pain or other symptoms; and any
> measures other than treatment that are used to relieve pain or other
> symptoms (20 CFR 404.1529, 416.929, and SSR 96-7p).

TR 18.

In finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible, the ALJ noted that Plaintiff's statements regarding her pain were inconsistent with her reported daily activities. TR 18, 20. Specifically, the ALJ stated:

> As previously mentioned, the claimant alleges having fibromyalgia
> pain throughout her body and is unable to stand or walk for longer
> than 30-45 minutes at a time or sit for one hour, yet testified that
> she performs a number of different household chores, including
> cooking, cleaning, laundry, and dishes, and even babysits a
> grandchild, with earlier statements noting that she drives an
> automobile and takes family members to appointments as needed.
> When asked if the claimant attends any fibromyalgia support
> groups, she testified in the negative. She stated that she would not
> be able to work at a job that is sit-down in nature, but when asked
> why, she only responded that she did not know what job she would
> look for and that she does not know how to use a computer.

TR 20, *referencing* TR 35-48, 143-50, 159-61,162-65.

As can be seen, the ALJ's decision specifically addresses comments made in Plaintiff's function report, fatigue and pain questionnaires, and hearing testimony, clearly indicating that these items were considered. TR 18-20. It is clear from the ALJ's rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings and

testimony that were inconsistent with some of Plaintiff's allegations. This is within the ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975).

After assessing all the of the medical and testimonial evidence of record, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." TR 18. As has been discussed, the ALJ thoroughly considered the medical evidence of record, as well as physician opinions, Plaintiff's testimony, and reports concerning Plaintiff's subjective complaints of pain and daily activities. TR 18-23. The ALJ found that Plaintiff's statements about her impairments conflicted with each other, as well as

with the medical evidence of record. *Id.*

The ALJ observed Plaintiff during her hearing, assessed the record in its entirety, reached a reasoned decision, and articulated the basis for that decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


_____
E. CLIFTON KNOWLES
United States Magistrate Judge

32